W. F. Enright, E. H. Lawhon, Edna Campbell, Frances Potter Willman, Moses Apple, Nate Block, William Abramson, C. A. Enos, E. C. Cook, L. Paul Forgrave, Lorren W. Garlichs, Henry Garvey, A. R. Goetz and Flora T. Goetz, Alexander Hamilton, E. G. Huddleston, Katie Neipp, Mary U. Neipp, T. M. Paul, William R. Seaman, Harry A. Smith, W. A. Thomson, R. A. Walker, Marion Land and William F. Kirkpatrick, doing business as R. L. Campbell Associates v. Commissioner.
W. Enright v. Commissioner
Docket No. 6473.
United States Tax Court
1945 Tax Ct. Memo LEXIS 8; 4 T.C.M. (CCH) 1102; T.C.M. (RIA) 45377; December 19, 1945
Richard L. Douglas, Tootle-Lacy Bank Bldg., St. Joseph 2, Mo., for the petitioners. Loyal E. Keir, for the respondent. DISNEY
Memorandum and Findings of Fact and Opinion DISNEY, Judge: The Commissioner determined deficiencies as follows: For the year ended
June 30,
1941
1942
Income tax
$3,215.65
$3,833.66
Declared value excess prof-
its tax
3,039.77
2,703.30
Excess profits tax
2,056.43
673.36 The questions to be determined are whether the petitioners *9 were engaged in business during the taxable years as an association taxable as a corporation, and in the alternative, whether, because of failure to file capital stock tax returns, the association is subject to declared value excess-profits tax at the maximum rates, as determined by the Commissioner, or is entitled to now file such returns and to a recomputation of such tax based thereon. Findings of Fact All of the petitioners above named are residents of St. Joseph, Missouri. W. F. Enright has been for about ten years past the president of the Empire Trust Company of that city. E. H. Lawhon is president and principal owner of Lawhon Construction Company, engaged in the contracting business. Negotiations between R. L. Campbell and Phillips Petroleum Company, a Delaware corporation and owner of an oil and gas lease executed April 1, 1939, by William A. Schock and Dora B. Schock, his wife, covering the west half of the Northeast Quarter and the East half of the Southwest Quarter of Section 29 and Lot 4, and Southeast Quarter of Section 20-1N-16E, all in Richardson County, Nebraska, resulted in the drafting of an "Assignment and Contract" dated July 6, 1940, to be entered into *10 within ten days from date by and between Campbell and the company. Under the terms of the agreement, the company assigned and transferred to Campbell, subject to a one-eighth royalty payable to the lessors and a two-eighths overriding royalty reserved to itself, all of its right, title and interest in and to the Schock oil and gas lease insofar only as it covered Lot 4, a tract of approximately 23 acres. Campbell was to commence the actual drilling of a well for oil production on or before 30 days from date, the entire cost of drilling, testing, completing and equipping the well to produce to be borne by Campbell. In the event the well to be drilled became a commercial producer, the company agreed to assign to Campbell all of its right, title and interest in the Schock oil and gas lease insofar as it covered the West half of the Northeast Quarter, Section 29, a tract of 80 acres, whereupon and within 30 days after the completion of the well on Lot 4, Campbell was to commence the drilling of a well thereon, the entire cost of drilling, testing, completing and equipping the well to produce to be borne by Campbell. The company reserved the right at all times and from time to time to purchase *11 any or all oil produced from the wells drilled on the premises assigned at the posted market price of the major purchasing companies for oil of like grade and gravity in the same vicinity and to purchase all gas and casinghead gas produced from the premises under the terms of the company's standard form of casinghead gas contract. It also reserved the right, in the event Campbell had an offer from a third party ready, able and willing to purchase all or any part of the leasehold estate involved, to purchase such interest in the lease at the same price and under the same terms and conditions offered by the prospective purchaser. In order to finance the drilling of the well it was necessary for Campbell to arrange for the assignment of a portion of his prospective interest in the Schock lease. Because of the provisions of paragraph 8 contained in the assignment and contract of Phillips Petroleum Company, in which it reserved the right to purchase any interest for which Campbell had an offer of purchase from a third person, Campbell obtained from the company under date of July 13, 1940, its consent to the proposed assignment by Campbell, in part as follows: "We hereby approve your *12 assignment of this seven-eighths (7/8) interest in Lot 4 of Section 20-1N-16E to your associates, provided such assignment or assignments are made expressly subject to all the terms and conditions of said Assignment and Contract of July 6, 1940, and provided further that it is distinctly understood that your remaining interest and the interest assigned to your associates remain subject to the provisions of said Paragraph 8, and that no further sales can be made without first giving this company an opportunity to purchase the interest you desire to sell under the terms and provisions of said paragraph." On July 17, 1940, Campbell as first party, and W. F. Enright and E. H. Lawhon, as second parties, entered into an agreement under the terms of which the second parties agreed to finance the drilling of the well as required under the Phillips Petroleum Company contract in return for the assignment to them of certain interests in the Schock lease to be acquired by first party. The second parties therein agreed that they would cause to be drilled the well referred to in the Phillips Petroleum Company contract. Campbell agreed that, upon the execution of such contract, he would assign *13 a 5/64 interest in Lot 4, Section 20, to Enright, also 5/64 to Lawhon and 5/64 to Willman, Jr., retaining 5/64 interest therein for himself, and the remaining 20/64 interest to Enright, Trustee, for the purpose of raising the necessary funds for drilling the well referred to by selling the 20/64 interest at the rate of $500 for each 1/64 interest and assigning to the various purchasers their respective interest at the time such purchases were made. Campbell further agreed, upon the execution of the Phillips Petroleum Company contract, to assign a one-fourth part of his interest in the West half of the Northeast Quarter of Section 29 and any further interest in the property which he might at any time thereafter acquire, to Enright, to Lawhon and to Willman, Jr. On or about July 18, 1940, Phillips Petroleum Company and Campbell executed the assignment and contract dated July 6, 1940, which assignment was duly recorded on October 23, 1940. Campbell and his wife, on or about July 22, 1940, executed instruments of assignment whereby his five-eighths interest in the Schock lease, in so far as it covered Lot 4, together with the personal property thereon or used or obtained in connection *14 therewith, subject, however, to the one-eighth royalty reserved to the lessor, the two-eighths overriding royalty and optional right of purchase reserved by Phillips Petroleum Company, and the optional right to purchase reserved by Phillips Petroleum Company in the contract of July 6, 1940, was assigned in undivided fractional proportions to the persons designated by the group as "promoters," as follows: 1/2
to Enright
1/8
to Lawhon
1/8
to Frances Potter Willman, wife of J. N.
Willman, Jr.
1/8
to Edna Campbell, wife of R. L. Campbell
1/8
to Enright Except for the assignment to Frances Potter Willman, none of such assignments were recorded. Under date of July 25, 1940, Campbell, referred to as "operator" and E. J. Shaffer, a drilling contractor, entered into a contract for the drilling of a test well on Lot 4, hereinafter referred to as Well No. 1, at a price of $6,900. The contract was carried out and production in commercial quantities was effected by October 1, 1940. Funds for drilling and equipment of Well No. 1 were provided by the individuals and in the amounts as follows: Alexander Hamilton
$ 500
T. M. Paul
1,000
Mary U. Neipp
1,000
Enright and Lawhon, jointly
7,500
Campbell, Lawhon, Willman and Enright,
jointly
2,000
$12,000
*15 Enright issued receipts to Hamilton, Paul, and Neipp, respectively, in form as follows: "RECEIVED OF Dollars, deposited with me upon the following conditions, and with the following instructions, for the following purposes: "1. - This deposit is made and accepted upon condition that a total of ten thousand dollars ($10,000.00) is deposited upon the same terms and conditions; otherwise, the amount of said deposit is to be returned to the depositor. "2. - All such deposits are made and accepted with instructions from the depositors, respectively, to negotiate a drilling contract with a responsible contractor to drill a test well for oil and gas, on Lot four (4) of the southeast quarter of Section twenty (20), Township one (1) North, Range sixteen (16) East, of Richardson County, Nebraska. and to deposit said funds in The Empire Trust Company, St. Joseph, Missouri, to be used for the purpose of paying the costs of drilling and equipping said well, if a producer in commercially paying quantities, and if completed as a producer in the Hunton lime, or at a lesser depth. "If oil or gas in paying quantities is not found in the Hunton lime, or at a lesser depth, the balance in *16 said fund, after paying the cost under such contract of exploring the Hunton lime, shall be used: "a) To pay the cost of drilling to lower horizons so far as sufficient, and "b) If oil or gas in paying quantities are found at greater depth than the Hunton lime, the amount remaining unexpended shall be used or applied so far as sufficient to pay the cost of equipping such well, and if such remainder be insufficient for that purpose, the remainder of such cost of equipping shall be paid out of first income from oil or gas, or both, on account of the interest in the oil and gas lease as to said Lot four (4), acquired by the undersigned, as hereinafter provided. "3. - There has been assigned to the undersigned, for the benefit of the depositors, an undivided one-half interest in an oil and gas lease dated April 1, 1939, recorded in Book 72, at Page 151, in Richardson County, Nebraska records, insofar as said lease covers said Lot four (4) above described, subject to the overriding royalty of two-eighths of all the oil and gas produced therefrom, reserved by Phillips Petroleum Company, so that the interest so acquired by the undersigned is an undivided one-half interest in a five-eighths *17 working interest, and is held by the undersigned for the pro rata benefit of the depositors; that is to say, each five hundred dollars ($500.00) deposited represents a one-fortieth (1/40) beneficial interest in said five-eighths working interest, or a one-sixtyfourth beneficial interest in the division of oil and/or gas production from said Lot four (4). "Until sold or disposed of, the working interests so transferred to the undersigned shall be held and managed for the benefit of the depositors, the net income therefrom, subject to the foregoing terms and conditions, distributed to the depositors pro rata, and will be sold and assigned by the undersigned when directed by the depositors (or a pro rata fractional interest, whether directed by one or more of them) to such person or persons, and at such price or prices as may be directed by the depositors, or some of them, subject, however, to the condition imposed by Phillips Petroleum Company in its assignment of said lease dated July 6, 1940, that before making any such assignment or conveyance, the interest so to be sold shall be offered to Phillips Petroleum Company at the price and on the terms and conditions which the undersigned *18 is authorized and directed and able to sell the same, all in accordance with paragraph eight of said assignment and contract dated July 6, 1940, from Phillips Petroleum Company. "4. - Any residue of the deposits not required and used for any purpose specified herein, shall be refunded pro rata to the depositors. "Dated at St. Joseph, Missouri, this day of July, 1940. ( (W. F. Enright, Agent and Depositary." No other receipts were issued at such time. Enright and Lawhon obtained the funds from Hamilton, Paul and Neipp, but since a number of friends and customers approached by each were not favorably impressed, Enright and Lawhon decided to assume the remainder of the $10,000, or $7,500 themselves. However, the fund required was underestimated and additional funds of $2,000 were paid in by Campbell, Lawhon, Willman and Enright, jointly. Under date of September 24, 1940, Campbell, Lawhon, Willman and Enright executed an operating agreement with respect to the Schock lease, which except for preliminary recitals, is as follows: "1. - Each of the parties hereto has and shall have in himself, or his nominee, an undivided one-eighth in the five-eighths working interest obtained *19 from Phillips Petroleum Company as to said Lot four (4) and the well thereon, and as to the west half of the Northeast Quarter of said Section twenty-nine (29) and any wells thereon, and, in the event a similar five-eighths working interest as to the one hundred twenty acres above described in said Sections twenty (20) and twenty-nine (29) is obtained from said Phillips Petroleum Company, each of the parties hereto shall possess a like interest therein. "2. - Notwithstanding, R. L. Campbell shall be the operator responsible to Phillips Petroleum Company, and notwithstanding any assignments of interests heretofore or hereafter made to the parties hereto, or their respective nominees, of undivided interests in said lease, all monies from the sale of oil or otherwise in the operation of said property, and pertaining to the interests of the parties hereto therein, shall be collected by and paid to W. F. Enright, who shall first pay and distribute therefrom all reasonable and necessary expenses of operation and distribute the net proceeds after payment of such expenses between the parties hereto, or their nominees, in proportion to their interests as herein stated, and the parties hereto *20 shall execute or procure the execution of proper letters of instruction or division orders authorizing and directing any pipe line company or purchaser of oil runs from any wells on any of said acreage to make payment accordingly to said W. F. Enright. "3. - No contract or obligation involving the sale of oil from any of said acreage, or the incurring of any expense in connection with the operations thereof of any kind or nature shall be made either by R. L. Campbell, as operator, or by the other parties hereto, except upon written authority or approval of W. F. Enright. "4. - No salary shall be paid to or claimed by any party hereto on account of any services rendered or to be rendered in connection with any of said operations. "5. - The parties hereto have employed Brown, Douglas and Brown to render such legal services as may be required, some of which have been heretofore rendered, on the following basis, which is hereby confirmed: If more than three producing wells are drilled (counting the well on said Lot four (4) as number one), said attorneys are to receive for services rendered and to be rendered hereafter an equal one-fortieth of the five-eighths working interest (one-sixtyfourth *21 of proceeds of oil production after payment of expenses) from the fourth and all subsequent wells on the acreage described in this agreement, including the one hundred twenty acres in Sections twenty (20) and twenty-nine (29), if obtained; and if four or more wells are not drilled, then they are to be paid reasonable fees in cash for services heretofore and hereafter rendered, which such fees, payable in cash, shall be a charge on the proceeds of oil production as an operating expense. "6. - None of the parties have any interest in any other leases which any other party to this agreement has or may hereafter acquire, and nothing in this agreement contained shall apply as to any acreage or interest herein not specifically described, nor shall anything in this agreement apply to an undivided half of the five-eighths working interest acquired or to be acquired and held in trust by W. F. Enright, as trustee, for persons providing funds to drill and equip wells on said acreage. "IN WITNESS WHEREOF, the parties hereto have executed this agreement in four counterparts, and Edna Campbell, assignee of R. L. Campbell, and Frances Potter Willman, nominee of John N. Willman, Jr., as the respective *22 title holders of said interests, have hereto set their hands and by so doing agree to and accept the provisions hereof, all as of the day and year first above written." The agreement was recorded on November 14, 1940. Operations as to all wells drilled on the Schock lease were conducted in accordance with the above agreement. On October 23, 1940, there was recorded an assignment executed by Phillips Petroleum Company on September 25, 1940, of all its right, title and interest in the Schock lease, in so far only as it covered the West One-half of the Northeast Quarter of Section 29, subject to all the terms of the contract entered into between it and the assignee under date of July 6, 1940. On or about October 31, 1940, Campbell and Phillips Petroleum Company executed an "Assignment and Contract," whereby the company assigned to Campbell, subject to a one-eighth royalty payable to the lessor and a two-eighths overriding royalty reserved to itself, its interest in the Schock lease in so far as it covered an additional 40 acres in Section 20 and an additional 80 acres in Section 29. This assignment and contract was similar in form to the agreement dated July 6, 1940, except that it *23 also provided that under certain conditions Phillips Petroleum Company had the right to release its two-eighths overriding interest in the production income of any well drilled on the tract involved and in lieu thereof receive from Campbell an assignment of an undivided one-half interest in each such well and the production therefrom, together with a like interest in and to all equipment, fixtures, and personal property appurtenant thereto or used in connection therewith. The instrument was recorded on January 13, 1941. By appropriate assignments executed by Campbell, his wife joining, Enright, Lawhon, Frances Potter Willman and Edna Campbell acquired undivided fractional interests in the five-eighths working interest in the Schock lease in so far as it covered the 80 acres referred to in the contract dated July 6, 1940, and the 120 acres assigned in the contract dated October 31, 1940, identical in amounts to the interests which they had respectively acquired earlier in the leasehold in so far as it covered Lot 4. The assignments of the lease in so far as it covered the 80-acre tract were subject to the one-eighth royalty reserved to the lessor, the two-eighths overriding royalty *24 of Phillips Petroleum Company and the optional right to purchase reserved by the company in the contract dated July 6, 1940. The assignments of the lease in so far as it covered the 120-acre tract were subject to the above reservations and in addition to the option reserved by the company to become half owner in any well drilled and equipment therefor as provided in the contract dated October 31, 1940. None of the assignments were recorded. Pursuant to drilling contracts executed by Campbell and Shaffer, in form substantially similar to the contract covering Well No. 1, four additional wells were drilled on the Schock lease during the taxable years, and their location and completion date were as follows: Well
Location
Completion Date
No. 2
80 acre tract
October 9, 1940
No. 3
Lot 4
November 24, 1940
No. 4
120 acre tract
December 29, 1940
No. 5
120 acre tract
September 26, 1941 Each well produced oil in commercial quantities. In order to provide funds for drilling and developing each of the wells numbered 2 to 5, inclusive, Enright raised the sum of $15,000 for each well from the persons designated by the group as investors and in the *25 amounts as follows: Investors
Amount
Alexander Hamilton
$ 750.00
T. M. Paul
1,500.00
Mary U. Neipp
1,500.00
Moses Apple
750.00
Nate Block
750.00
Nate Block and William Abram-
son, jointly
750.00
C. A. Enos and E. C. Cook,
jointly
750.00
L. Paul Forgrave
750.00
Lorren W. Garlichs
750.00
Henry Garvey
750.00
A. R. Goetz and Flora T. Goetz,
jointly
750.00
E. G. Huddleston
750.00
Katle Neipp
750.00
William R. Seaman
750.00
Harry A. Smith
750.00
William A. Thompson [Thomson]
750.00
R. A. Walker, Marion Land and
William F. Kirkpatrick, joint-
ly, in the name of Walker
Manufacturing and Sales Corp.
750.00
Enright and Lawhon, jointly
750.00
Total
$15,000.00 Receipts issued to Hamilton, Paul and Neipp for the above deposits on Well No. 2 were similar in form to the receipts issued with respect to Well No. 1, except that amount deposited by each was $750 and the total deposit was $15,000, that the deposits were to be applied to the cost of drilling a well on the West half of the Northeast Quarter of Section 29, and the following paragraph was added: "6. - The above named depositor agrees to deposit, upon the same conditions, *26 with the undersigned agent, an additional seven hundred fifty dollars ($750.00) for each additional well to be drilled upon the acreage described in paragraph two hereof, and other acreage in the locality thereof in which the agent and depositary may acquire a similar interest, until a total of five wells is drilled; provided, this obligation shall terminate at depositor's option, if the first or any subsequent well be a dry hole, and if the depositor relinquish his interest except as to well locations upon which commercially producing wells have been completed. In case any subsequent well after the first is a dry hole, any funds deposited therefor and not used shall be refunded, as provided in paragraph fifth." The receipts were signed by the above depositors evidencing their agreement to the terms and conditions thereof and the assumption of the obligations stated in the above-quoted paragraph 6. Receipts in the same form were also issued to the other depositors, except Lawhon and Enright to whom no receipt was issued, except that such receipts also covered an additional sum of $750.00 deposited by each, as to which the receipt stated as follows: "The other seven hundred fifty *27 dollars ($750.00) of said deposit and payment entitles the depositor to an undivided one-fortieth beneficial interest in the five-eighths working interest in the oil and gas lease described in paragraph three hereof, insofar only as said lease covers Lot four (4) of the southeast quarter of Section twenty (20), Township one (1) North, Range sixteen (16) East, in Richardson County, Nebraska, containing about twentythree (23) acres, upon which a completed oil well is located, which such beneficial interest is of the same character as described in paragraph four hereof." Such additional deposits of $750 were allocated by Enright as an investment interest with respect to Well No. 1. Receipts subject to the same terms and conditions were issued to the same depositors, except Lawhon and Enright, upon payment of subsequent deposits made for the financing of Wells numbered 3, 4 and 5, respectively. Legal title to no part of the one-half of the five-eighths interest assigned to Enright was ever transferred by him to any of the depositors as none of them ever made a request therefor. Under date of January 31, 1941, Enright executed a declaration of trust, which after preliminary recitals *28 provided as follows: "NOW, THEREFORE, in consideration of the premises, and of one dollar in hand paid by the said R. L. Campbell, one of the said assignors, receipt of which is hereby acknowledged, I do hereby declare that I do and shall at all times stand seized of title to the interests in said lease so assigned and described in the assignments referred to IN TRUST to provide by means thereof funds necessary for the drilling and equipping of such wells as may be required to be drilled to the extent of not more than $15,000.00 for any one well and as to each well and location thereof for the pro rata benefit of the persons providing such funds for the purposes aforesaid, and upon condition that the interest so assigned to me shall revert to my assignor as to any undeveloped acreage in the event of failure to provide in the manner herein described for contemplated funds for the drilling of any wells which may be required to be drilled, in accordance with the obligations of said lease and said contracts and assignments between Phillips Petroleum Company and said R. L. Campbell." Such declaration of trust was not recorded. Under date of November 12, 1941, Campbell, Lawhon, Willman, *29 Jr., and Enright, individually and as trustee, assigned to Phillips Petroleum Company an undivided one-half interest in Well No. 4, including an undivided one-half interest in all the equipment in or appurtenant to such well, in consideration of the release by the company of its two-eighths overriding royalty in the production income from such well. The total drilling and development costs for each of the five wells drilled on the Schock lease were as follows: Well
Cost
No. 1
$19,025.10
No. 2
16,534.22
No. 3
16,972.01
No. 4
17,619.83
No. 5
18,300.77 Intangible development costs were capitalized as to Wells Nos. 1 and 4, and charged to expenses as to the other wells. The cost in excess of $15,000 for drilling and developing each well was paid from the income of such well. The depositors were not called upon to pay any sums in excess of their respective pro rata portions of $15,000 for each well. Payments for oil runs were made pursuant to division orders by the pipeline companies semi-monthly by check drawn to the order of Enright for one-half of the current oil runs and by check drawn to the order of Enright, Trustee, for the remaining one-half *30 of the current oil runs. All such checks were endorsed by Enright and deposited in the bank account in the name of "R. L. Campbell Associates" in the Empire Trust Company, St. Joseph. No receipts were required by the pipeline companies in evidence of its remittances. Enright drew all checks on the bank account except when he was absent from the city, in which event Lawhon signed the checks. Division orders to the pipeline companies were signed by Phillips Petroleum Company, Campbell, Edna Campbell, Lawhon, Willman, Frances Potter Willman, and Enright, individually and as trustee. Enright supervised the payment of all expenses and distributons of net income which were usually made on a monthly basis. Distribution checks were made out by an accountant of an accounting firm employed by Enright upon authorization from his associates, and delivered to Enright, who, in turn, mailed the checks to the distributees. The checks were in ordinary form and there was no notation on them indicating the purpose or source of the distributions. No receipts were required of the distributees. Enright did not issue a separate check for each well, but rather lumped together each distributee's share of *31 production income from all of the producing wells into one check. Through October 1941 distributions of net income were made in even amounts. Enright determined the amounts to be distributed upon the basis of the cash available. Supplemental distributions were made to distribute the full excess of income over expenses for the months of August, September, and October 1941. After Phillips Petroleum Company acquired an undivided one-half interest in the production from Well No. 4 and through March 1942 Enright remitted to the company for its share of distributable income from such well. Thereafter, the pipeline company remitted directly to the company for its share of gross production income, and Enright billed the company for its pro rata share of expenses. Up to October 1942 Enright made no distributions with respect to Well No. 5 due to the necessity of accumulating funds to meet development and equipment costs. In some months the cost of operating Well No. 5 exceeded income from oil runs and in those instances the operating expenses, to the extent they exceeded the oil runs, were paid out of funds belonging to the promoters and investors, respectively, derived from oil runs from *32 other wells. Under date of April 12, 1943, Enright entered into a contract of sale with the Nebraska Producing and Refining Company, of Salem, Nebraska, for the sale to that company of the five-eighths interest in the Schock lease, together with all equipment thereon for $19,000, payable $5,000 in cash and the remainder on or before two years after date, evidenced by a promissory note secured by chattel mortgage on all equipment and an assignment of all oil runs from wells in the leasehold. Authority to negotiate the sale was granted to Enright by powers of attorney executed by all the associates to Enright and Lawhon. Pursuant to the contract the purchaser company executed a promissory note in the amount of $14,000 and a chattel mortgage in favor of "W. F. Enright, Agent and Trustee for R. L. Campbell Associates and all the parties to the operating agreement dated September 24, 1940, recorded in the office of the Register of Deeds of Richardson County, Nebraska, in Book 78, at Page 392," and an assignment of the interest of petitioners to the purchaser company was executed in April 1943 by Lawhon and Enright individually and as agents and attorneys in fact for Edna Campbell, R. *33 L. Campbell, Frances Potter Willman and Enright, Trustee for R. L. Campbell Associates. Beginning with the month of November 1942 no distributions of net income were made with respect to any of the wells until after the sale to the Nebraska Producing and Reflning Company, when all cash funds in excess of the amount necessary to pay the taxes proposed by respondent, plus interest thereon, were distributed. Distribution of the proceeds of final sale was made on the basis of 48 per cent allocated equally among the so-called promoters, Enright, Lawhon, Edna Campbell and Frances Potter Willman, and 52 per cent allocated among the so-called investors. Distribution of the proceeds of sale were not made on a fifty-fifty basis between promoters and investors because of the acquisition of Phillip Petroleum Company of an undivided one-half interest in Well No. 4 and its equipment, the share of the promoters in such well and equipment having been assigned to the company. By appropriate endorsements attached to all automobile liability, public liability and fire insurance policies all of the petitioners, except Edna Campbell and Frances Potter Willman were designated as the assureds. In lieu *34 of the latter two petitioners, R. L. Campbell and J. N. Willman, Jr., were designated as assureds. Pursuant to Enright's instructions the accountant designed an accounting system which reflected the operations of each well. A separate investment account was kept for each member of the enterprise, showing the amounts invested with respect to each well, the sums distributed from production income and the proportionate part of net profits credited at the end of each fiscal year. The investment accounts for all members were identical in form, and the caption thereof consisted of the name of the member followed by the word "Investment." The entries on such accounts representing distributions of production income were in lump sum amounts for all wells combined. However, if any member had requested a division of the distribution to show the income from each well, it would have been possible to have given it to him, except as to wells numbered 1 and 3. On the monthly income and expense statements the income and expenses of each well were shown separately, except as to wells numbered 1 and 3. After production decreased the oil from these two wells was pumped into the same tanks and hence *35 it was impossible to determine the quantity of oil coming from each well. Although among themselves, Campbell, Enright, Lawhon, and Willman were referred to as promoters and the other members as investors, no such designation appeared on the books of account or were used in dealings with outsiders. The petitioners maintained no office or office space for the transaction of the business of the enterprise. The bookkeeping was done at the office of the accounting firm. All communications, oil runs, bills, receipts and the like came to the desk of Enright in the Empire Trust Company. The letterhead used was as follows: R. L. CAMPBELL ASSOCIATES EMPIRE TRUST BUILDING St. Joseph, Missouri
The actual detail of verifying bills and reports from operators was handled by the accountant, who also prepared monthly balance sheets and statements of income and expenses which were in turn sent out by Enright together with a mimeographed letter written by him in explanation of the financial statements and reporting progress of the various wells and matters of interest with respect to the enterprise. Campbell, who was the only one of the group, except Willman, who knew anything about oil production, *36 selected the sites for the drilling of the wells, executed the drilling contracts, supervised drilling, purchased equipment, employed labor to operate the wells, and in general supervised the operation of the wells. Willman assisted Campbell on the first two wells. All of Campbell's activities were carried out with Enright's full knowledge and authorization. The salaried employees consisted of a field superintendent and four or five pumpers, all of whom were hired by Campbell. Neither Campbell nor Enright received salaries for services rendered. About every two months the petitioners met informally at a dinner in a hotel for the purpose of discussing and deciding any questions of policy and operation "out of the ordinary run." About 75 per cent of the members usually attended such meetings, together with counsel and the accountant of the group. No election of officers was ever held. Petitioners filed partnership returns on Form 1065 for each of the taxable years in the Sixth District of Missouri in the name of R. L. Campbell Associates and signed by Enright. No capital stock returns were filed by petitioners. The petitioners did not, in the taxable years, constitute an association *37 taxable as a corporation. Opinion The Commissioner determined that "R. L. Campbell Associates" were during the taxable years an association within the meaning of section 3797 (a) (3) of the Internal Revenue Code and as such taxable as a corporation. Section 3797 (a) (3) is as follows: (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof - * * * * *
(3) Corporation. - The term "corporation" includes associations, joint-stock companies, and insurance companies. Whether or not an enterprise constitutes an association taxable as a corporation depends upon its own peculiar facts. Keating-Snyder Trust v. Commissioner (C.C.A., 5th Cir.), 126 Fed. (2d) 860; Thrash Lease Trust v. Commissioner (C.C.A., 9th Cir.), 99 Fed. (2d) 925; Stantex Petroleum Co., Trustee, 38 B.T.A. 269, 272. In Del Mar Addition v. Commissioner (C.C.A., 5th Cir.), 113 Fed. (2d) 410, it is stated: In cases involving the question of whether a business entity is, for taxation purposes, a corporation as defined by Section 801(a)(2) of the Revenue Act of 1934, or a partnership *38 under the definition of Section 801(a)(3) thereof, and the entity does not conform to either definition entirely, the test applied is which of the two it more closely resembles. This is a question of fact * * * Herein, Campbell, in July 1940, negotiated for and acquired the assignment to himself of a 40/64 working interest in a 23-acre tract known as Lot 4 from Phillips Petroleum Company, owner of the Schock lease, for the purpose of drilling an oil well thereon. In order to finance the drilling and development of such well, Campbell agreed to and did assign a 5/64 working interest each to Frances Potter Willman, Lawhon and Enright, retained a 5/64 working interest for himself (later assigned to his wife), and did assign the remaining 20/64 working interest to Enright, as trustee, for the purpose of resale to others at $500 for each 1/64 working interest in order to obtain $10,000 in cash, the amount at that time deemed sufficient to cover the expense of drilling and equipping a well. Campbell, with the approval of Enright, entered into a drilling contract, pursuant to which a well was drilled, which produced oil in commercial quantities by October 1, 1940. Campbell by assignment *39 from Phillips Petroleum Company acquired additional lands under the Schock lease and four additional wells were drilled which also produced oil in commercial quantities. Only five of the 20/64 working interests held by Enright as trustee were sold at $500 each to Hamilton, Paul, and Mary U. Neipp, for financing of Well No. 1, Enright and Lawhon jointly advancing the remaining $7,500. To finance the second well, it was decided that each 1/64 working interest in that and subsequent wells would be sold at $750, it having been found that $10,000 was not sufficient, since it had been necessary to raise $2,000 for the completion of Well No. 1, and that amount had been contributed by Campbell, Lawhon, Willman and Enright. Upon the financing of Well No. 2, the entire 20/64 working interest held by Enright as trustee in that well was sold as shown in our findings of fact and in addition the purchasers, other than Hamilton, Paul, and Mary U. Neipp, purchased similar interests in Well No. 1. Wells Nos. 3, 4, and 5 were financed in similar manner. The amounts paid for the 20/64 working interests in five wells were paid to Enright. Campbell supervised the drilling of the wells, purchasing of *40 equipment, and the production of oil, and Enright supervised the financing, payment of bills and the collection and distribution of income. Upon division orders to the pipeline companies signed by Campbell and his wife, Lawhon, Willman and his wife, and Enright, individually and as trustee, such companies made payment semi-monthly for oil runs in two checks identical in amount, one payable to the order of Enright, covering the 20/64 working interest owned by Edna Campbell, Frances Potter Willman, Lawhon, and Enright, and the other payable to Enright, trustee, covering the 20/64 working interest held by Enright as trustee. From November 12, 1941, when Phillips Petroleum Company acquired an undivided one-half interest in Well No. 4 in lieu of its overriding 2/8 royalty in the production thereof, through March 1942, Enright remitted to the company for its distributable income from such well. Thereafter, the pipeline company remitted directly to the Phillips Petroleum Company for its share of the income from such well and Enright billed it for its pro rata share of expenses on Well No. 4. The 1/8 royalty payable to the lessors or assignees and the 2/8 overriding royalty payable to Phillips *41 Petroleum Company were paid by the pipeline companies directly to the lessor or assignees and Phillips Petroleum Company, respectively. The contracts for the assignment of the various tracts of land under the Schock lease and the drilling of wells were executed by Phillips Petroleum Company and Campbell, the drilling contracts were executed by Campbell, and the receipts given to the depositors were signed by Enright as "Agent and Depositary." The bank account of the enterprise was in the name of "R. L. Campbell Associates." One-half of the 5/8 working interest acquired by Campbell in the various tracts and wells under the Schock lease were held by Edna Campbell, Frances Potter Willman, Lawhon, and Enright as tenants in common until November 12, 1941, when Phillips Petroleum Company acquired from them a one-half working interest in Well No. 4, and the remaining one-half was held by Enright, as trustee, for the benefit of the depositors, or those who contributed the money for the drilling and equipment of the wells. Although it was provided in the contract dated July 17, 1940, that Enright assign to the various purchasers their respective interests in the 20/64 working interest he held *42 in trust, he never did so. No assignments could be made by any of the owners of the interest acquired by Campbell without first giving Phillips Petroleum Company an opportunity to purchase the interest desired to be sold under the terms of its contract with Campbell as modified under date of July 13, 1940. No office or office space was kept by the enterprise and no officers or managers were ever elected or appointed. Informal meetings at dinners were had about every two months, called by Enright, at which matters "out of the ordinary run" were discussed. The sale of the interests of the parties was discussed at such meetings at least six months before the actual sale thereof. Criteria as to whether the enterprise herein involved was in the taxable years an association taxable as a corporation have been broadly laid down by the Supreme Court in Morrissey v. Commissioner, 296 U.S. 344; Swanson v. Commissioner, 296 U.S. 362; Commissioner v. Combs, 296 U.S. 365; Commissioner v. Coleman-Gilbert Associates, 296 U.S. 369; and *43 Burk-Waggoner Oil Association v. Hopkins, 269 U.S. 110. The above cases lay down no absolute test. In the latter, wherein the taxpayer was an unincorporated joint-stock association which under the laws of Texas was not regarded as a legal entity, but as a partnership, the shareholders of which were individually liable for its debts as members of a partnership, the Court stated: * * * It is true that Congress cannot make a thing income which is not so in fact. But the thing to which the tax was here applied is confessedly income earned in the name of the association. It is true that Congress cannot convert into a corporation an organization which by the law of its state is deemed to be a partnership. But nothing in the Constitution precludes Congress from taxing as a corporation an association which, although unincorporated, transacts its business as if it were incorporated. The power of Congress so to tax associations is not affected by the fact that, under the law of a particular state, the association cannot hold title to property, or that its shareholders are individually liable for the association's debts, or that it is not recognized as a legal entity. Neither the *44 conception of unincorporated associations prevailing under the local law, nor the relation under that law of the association to its shareholders, nor their relation to each other and to outsiders, is of legal significance as bearing upon the power of Congress to determine how and at what rate the income of the joint enterprise shall be taxed. It is clear that the enterprise herein was a joint enterprise entered into for profit. But all joint enterprises or ventures entered into for profit are not associations taxable as corporations. Section 181, Internal Revenue Code. However, herein the "thing to which the tax" is sought to be applied is not confessedly or factually "income earned in the name of the association." The income was earned in the name of the persons who had an interest in the Schock lease, i.e., 1/8 (or 8/64) royalty in the name of the lessor or assignees, 2/8 (or 16/64) overriding royalty in the name of Phillips Petroleum Company, 5/64 each in the name of Edna Campbell, Frances Potter Willman, Lawhon and Enright, which upon their direction was paid to Enright, and 20/64 in the name of Enright as trustee for the depositors. That the income from *45 the 40/64 interest in the production of the wells, together with the sums paid in by the so-called depositors or investors, was deposited in a bank account in the name of R. L. Campbell Associates is not determinative under all the circumstances. It was understood by all that the expenses of the drilling and operation of each well was payable equally out of each deposit and prospective criteria. It was therefore a matter of convenience to have some common bank account and an agent to take care of such expenditure out of the funds contributed and collected. The account was primarily under the control of Enright, who was clearly designated as agent, at least in so far as the depositors or investors were concerned, for such purposes. Although there was what might be termed in one sense centralized management of the enterprise in Campbell and Enright, no provision was made for any successor to either Campbell or Enright. Ownership of the five-eighths working interest in the Schock lease was not in R. L. Campbell Associates, an association, but was held in undivided interests by four individuals and Enright, as trustee, respectively, and remained so held during the taxable years, except *46 for the undivided one-half interest in Well No. 4 and its equipment assigned to Phillips Petroleum Company November 12, 1941. The receipt given to each depositor and evidencing his rights speaks of "working interests so transferred to the undersigned," and that they "shall be held and managed for the benefit of the depositors." The reference is to earlier language which states that, "There has been assigned to the undersigned, for the benefit of the depositors, an undivided one-half interest in an oil and gas lease * * *." (Italics supplied.) That such undivided interests in the oil and gas lease were individually owned and held by the depositors is evidenced by the provisions as to sale thereof. Any such interest, the receipt recites, "will be sold and assigned by the undersigned when directed by the depositors (or a pro rata, fractional interest, whether directed by one or more of them) to such person or persons, and at such price or prices as may be directed by the depositors, * * *." It is plain then that R. L. Campbell Associates, as an association, could not have disposed of the interests of either the promoters or the investors as its property. To sell their interests it was *47 necessary for Enright to be directed, by each depositor, to sell; and in the final sale he first obtained powers of attorney from each of them. Each depositor could have required assignment to him of his interest. The depositors' individual ownership was indicated also by their names (except the wives of Campbell and Willman) on insurance policies. It is not without significance also that Phillips Petroleum Company (the original lessee from William A. Schock and wife) after its acquisition, under its contract, of the one-half interest in Well No. 4, participated in the general arrangement here involved, in that it paid to Enright its pro rata share of the expenses. In fact, through March 1942, Enright remitted to Phillips Petroleum Company its share of the income from the well. The Phillips Petroleum Company could not, with logic, be regarded as part of an association taxable as a corporation, yet it did partake to the limited extent above suggested in the arrangement here involved. Although personal responsibility of the participants is, under the cases above examined, only one of the factors to be considered in this question and is not determinative, nevertheless, it is of importance, *48 and in the facts here involved, we see personal responsibility on the part of the depositors who participated. The receipts show that they constituted "instructions from the depositors, respectively, to negotiate a drilling contract * * * to drill a test well for oil and gas." Though later in the receipt it is provided that if the funds are insufficient to pay cost of equipping the well, the remainder shall be paid out of first income therefrom, it is noteworthy that no provision appears to relieve the depositors from responsibility for cost of equipping the well, if after it was equipped the oil production proved insufficient to pay for such equipment. It is true also that on the first well Enright, Lawhon, Campbell and Wilman raised the $2,000 necessary for equipment, above the $10,000 deposited, but under all the circumstances here this does not indicate lack of pro rata liability on the part of the depositors. The "promoters" may well have believed it expedient, in the light of their future relations with the depositors on other wells contemplated, not to raise the question of the depositors' liability, which they might otherwise under the contract have raised. That personal responsibility *49 on the part of the depositors was recognized, is also indicated by the fact that when in some months operation costs as to Well No. 5 exceeded income therefrom, the moneys belonging to the depositors from income from other wells was used to cover the deficit and operating costs as to Well No. 5. As each well was a separate arrangement, had there been no personal liability, unpaid costs of one well would not have been deductible from the income from another. Also, the operating agreement covering the Schock lease provided, among other things, for attorneys' fees, and that if four or more wells were not drilled, then the attorneys were to be paid reasonable fees in cash for services rendered. Although this agreement was entered into by Campbell, Lawhon, Willman and Enright and is not particularly provided for in the depositors' receipts, it is apparent that it is a clear obligation of the four petitioners last above named, and as to the other petitioners, the depositors as well, since they instructed the negotiation of a drilling contract, and accepted the provision that "the net income" from the lease should be distributed to them, and since the expenses on all wells were conducted *50 in accordance with the operating agreement, we think the depositors recognized their responsibilities under that agreement. We find in the whole arrangement no negation of personal liability on the part of the participants, and conclude that personal liability remained upon all of the participants in the contracts here involved. We have noted also, what we consider of weight on this question, the fact that, under the receipts given depositors as to all wells after the first, that the depositors could withdraw from the arrangement if any well proved to be a dry hole, upon relinquishment of his interests, except as to commercially producing wells. Such a right is not consistent, we think, with similarity to those associations which have been held taxable as corporations. Considering all of the facts, though not enumerating here all tending toward our conclusion, in our opinion they do not indicate the necessary similarity to corporate form of business management, but bring it within the line of cases such as Commissioner v. Rector & Davidson (C.C.A., 5th Cir.), 111 Fed. (2d) 332, certiorari denied, *51 311 U.S. 672; Commissioner v. Horseshoe Lease Syndicate (C.C.A., 5th Cir.), 110 Fed. (2d) 748, certiorari denied, 311 U.S. 666; Commissioner v. Gerstle (C.C.A., 9th Cir.), 95 Fed. (2d) 587; Stantex Petroleum Co., 38 B.T.A. 269; C. A. Everts, et al., Jamison Lease Syndicate, 38 B.T.A. 1039; T. A. Johnston, Trustee, Victory Lease, 38 B.T.A. 1199 (Petitions for review dismissed, C.C.A., 5th Cir., and C.A.D.C.); E.L. Cord, 38 B.T.A. 1372P-H Group, 43 B.T.A. 1041. It is our conclusion upon all the facts that the enterprise more nearly resembled a partnership than a corporation and that during the taxable years the enterprise was not an association taxable as a corporation, within the meaning of the applicable statutes. In view of our conclusion, it is not necessary to consider the alternative issue presented by petitioners. Decision will be entered for the petitioners.